And we'll move on to our second argument set for today, Kava Holdings v. NLRB. May it please the Court, Carl Terrell on behalf of Hotel Bel Air Petitioner for review. In all of the appellate cases involving 8A3 discrimination in a mass hiring case, cited by both parties in this case, including the Ninth Circuit decision in Coleman v. NLRB and in New Breed Leasing, also in the D.C. Circuit cases, Great Lakes Chemical and CNN America, as well as in U.S. Marine Corps, a corporation rather, a seventh-circuit corporation. In the Ninth Circuit case, the decisions that were found in favor of the board and the union finding animus contained far clearer evidence of animus than we see in this case. But that doesn't mean that that's the outer bounds of animus. I'm sorry, Your Honor. I mean, that doesn't mean that something less than that couldn't also meet animus. Certainly, Your Honor. However, in this case, by contrast, there is no evidence of any sort of planning to not hire the former employees. But what about the idea that this – I mean, your client has already been found to have violated the NLRB in other cases, and that time the NLRA in other cases, and the timing there was pretty coextensive with this. Why can't that be evidence of animus? It was one case, Your Honor. It was the effects bargaining case from two years prior. One of the real problems with this case is this court was given no explanation or reasoned explanation in the decision supporting the application of Hotel Bel-Air One as a basis for animus in this case. Further, the facts in the issue – You mean the board didn't rely on that? You're saying the board didn't rely on Bel-Air One? The board devoted one sentence and a footnote of another sentence, two sentences entirely in the ALJ decision simply declaring that animus was supported by the first HBA One case, Hotel Bel-Air One case. But it did not go into any explanation whatsoever as to why it was relying, according to its declaration, on that providing animus in the finding case. It didn't discuss the issue of timing. It didn't discuss the issues of the issues at issue in that case and how they relate to this case. Why would it need to? I'm sorry, Your Honor? Why would it need to do that? As stated by – and it's well established, but as stated by the Supreme Court, an agency must – agency order must be upheld, if at all, on the basis articulated. And there was no articulation. But if you, in addition – Well, there was the articulation of we're reaching this conclusion, at least in part, because of this prior decision. Forgive me, Your Honor. I didn't quite catch the question. We can conclude from the record that the agency says we're reaching this conclusion, in part, because of this prior decision. Right. Why do they have to go into great detail about what about that prior decision supports their conclusion? Because it's not an automatic. It's simply because there is another case finding animus that that animus is applicable and is continuing animus or relates or supports animus in the present case. And if you look at the facts in the two different cases, they're very different. The issue – Well, don't they arise out of the same course of conduct? Forgive me, Your Honor. Don't they arise out of the same course of conduct, meaning the temporary closure of the hotel and the process and the question of whether the hotel would have any duty – ongoing duty to bargain and whether – I mean, it's the same group of employees, the same issue that the second case, the case we're dealing with now, which is held in abeyance pending the first one, correct? It's two parts of the same story, but it's not the same course of conduct. The first case was a collective bargaining issue, and the sole issue in that case and the sole finding was simply that the employer prematurely reached impasse. Impasse is a historically perennially difficult issue to deal with. In that case, though, there was 17 face-to-face meetings, almost a year of bargaining. We're not at liberty to revisit the board's decision in Hotel Bel Air 1, right? And that was enforced by the D.C. Circuit, so we can't – you're not going to re-argue – We're not re-arguing. What I'm arguing is that – It's just not – they needed to give some explanation for why that was relevant to this. We can't impute those because the agency – Correct. It's not automatic. When you objected to the ALJ decision to the NLRB, did you say that the ALJ did not adequately explain their reliance on Hotel Bel Air 1? Was that in your briefing? Yes. To the NLRB? Yes, I'm certain that it was, Your Honor. Can you tell me where in the record that is? I'm sorry? Can you show me where in the record that is? I can't at this moment, Your Honor, but I'd be happy to respond to that after the hearing if that's permitted. The issue is, yes, there was a finding by the first Hotel Bel Air case that the Hotel Bel Air prematurely reached impasse or declared impasse, and following that, it implemented part of its proposal, which it is permitted to do if impasse is legal. That's a very narrow, technical, really anodyne form of animus, which doesn't relate or support the animus alleged in this case, which has completely different actors, and key to that is the fact that the decision makers in the interview process – this is about a mass hiring case – almost virtually, with one exception, all new managers were engaged in the hiring process two years later in October of 2011. They were not involved in the collective bargaining. Can I ask you, when you rehired, you set a specific time where the old hires could come back and apply. Why did you do that? Why did you segregate them out? Because the ALJ and then the board say, well, that is already suspicious to begin with, and then once we map it out, it turns out that a lot of these people weren't rehired. So why didn't you just have everybody apply at the same time? What was the basis for it? Well, there was no attempt to hide the fact, and there was no hiding the fact who, in applying, was a former employee or not. They also submitted applications in which they would have revealed that they were former employees. I think truly it was just a courtesy to those employees. To give them, yeah. To give a courtesy. They were sent letters directly to each of them advising that they could come down and apply. But what about the evidence that many of them – I mean, the board, the ALJ and then the board rely on evidence that, you know, very few of them were rehired, and some of those reasons were not adequate. I mean, why isn't that satisfied the substantial evidence standard? Well, first of all, the board rejected the ALJ's determination that the disparity in numbers provided a basis for the animus. That was stated in an important footnote in the board decision. The board decision basically rubber-stamped this ALJ's decision, but one thing they did disagree with was the ALJ's reliance on the disparity in numbers. So that's out of the picture. So beyond that, there are really just three issues. There's the Sandra Arbizu testimony by the Human Resources Generalist. There is the imputation of animus from Hotel Bel Air 1, which we've talked about here a bit. And then there is the – Inadequate reasons given. The inadequate reasons, but as a basis for animus, the cherry-picked examples by the ALJ. She pointed to 14 examples out of 176 former employee applications, and all she had before her was the documentary evidence, the two-page interview form that was used to be filled out for all three interview levels, bearing in mind that this employer had a large job hiring fair and interviewed a lot of people in quick order. And most importantly, the general counsel failed to call witnesses in this case. The general counsel only called five witnesses out of all of these 176 applicants. Compare CNN America, relied upon by the opposing side. That was an 82-day case with extensive testimony from the applicants who applied and which provided a basis for that court and the board in that case to legitimately find that there was a sham hiring process going on. How would we define – I mean, how would we set a standard, though, if we ruled for you? Because at the end of the day, you agree this comes down to substantial evidence. Right. I mean, it may well be that if any one of us were sitting there deciding this evidence, we might not have come to that conclusion, but the ALJ and the board did. And so why – on what basis do we say, like, 14 out of 176 just isn't enough, that that doesn't satisfy the substantial evidence standard? What's the case we can rely on to say that? You know, we take the cases as they come, and we look at the facts that we have before us. And I'd love to talk about the Sandra Arbizu testimony as a basis for substantial evidence. It doesn't make any sense. It just simply is inadequate by a process of reasoning, by the wisdom and the justice that this court has called upon. Let's assume that we agree with you on that. Let's assume that we agree that they needed to say more than one sentence in the Hotel Bel-Air. But what about the inadequate reasons? Why is that not enough? I mean, yeah, maybe it's a stretch. Maybe it's an implication that might not be completely fair. But why isn't it enough to support a substantial evidence? You know, I do not know, Your Honor, a hard and fast bright-line rule that defines substantial evidence because every case is different. I have to say that I think the rule is that we have to say that no reasonable fact-finder could have found that in that circumstance. And I would... I mean, that's a high bar. I mean, you know, maybe one in a hundred would have, but that seems to still be enough. If the administrative law judge who, again, is required to explain and the board in its decision is required to give reasoned decision-making, that's how agencies work. And the NLRB, unlike many federal agencies, most federal agencies, it issues its rules, its decisions by adjudication. That's why NLRB decisions are so terribly lengthy. It's because they are required to articulate their reasons and they're required to demonstrate that. But here we have a case where there was a voluminous available record for this court, for the board, excuse me, to base its decision upon, and instead it had no testimony and it only had these inherently unreliable interview forms. We didn't object to the omission of those documents. In the ALJ hearing, CAVA didn't object to the omission of those documents, correct? Did we object to the omission of the documents? I don't believe we did, Your Honor. And we addressed that in our reply brief. Hearsay is more readily acceptable in an agency hearing, but as this court said in Calhoun v. Postmaster General, this court, when assessing the evidence for meeting the substantial evidence standard, this court must look at the evidence and weigh whether that hearsay admitted was reliable, trustworthy, and had earmarks of trustworthiness. These were documents that were filled out, some accurately, some less than accurately, five years earlier when memories are lost. There was no cross-examination because the general counsel chose to call only five witnesses. Well, your client was represented at that hearing, correct? I was in part of the hearing. And so have you pointed, you could have cross-examined witnesses, you could have challenged the accuracy of those documents, you could have provided a different analysis of those documents. I don't see anything in your briefing on appeal that tells me the ALJ's description of the examples given was inaccurate. I don't see you pointing to any other of the records in the record saying that those show support your contention that these decisions were made for legitimate non-discriminatory reasons. The documents were what they were. And they were documents that at that point, at the time of the hearing, were six years old. They were documents that were filled out in a rapid fashion during the job fair hiring process. They said what they said. But the ALJ simply cherry-picked 14 examples and then reached broad conclusions that the hiring process was a sham and was an indication and supported animus. How many examples did they need to pick? Out of 176, they had to get to 20, they had to get to 30, they had to get to 40. Like what, I mean, I understand the position of, you know, cherry-pick, but it's the same argument that comes up in a lot of these substantial evidence cases is, you know, they relied on evidence that you would rather that they didn't rely on. But why is, I mean, what's the threshold? I mean, do we issue a rule that says, look, if you're only going to look at less than 10% of the applicants, that's not enough? Or, I mean, what's the rule we adopt? Well, it was 8% in this case. And the board council and union council attempt in their briefs to support that and to supplement it with other evidence. But the record before this court is only those 14 pieces of paper and broad generalizations. The FDA doesn't have to literally discuss every example that exists. Is that your argument, that they can't just say, I have a note, I'm going to discuss with specificity some of the examples? And, I mean, to me, that's fairly normal decision-writing practice to say, here are some, the record includes these examples, and not exhaust every example that exists in the record. And I don't see anything in your briefing that says, you know, there are these 10 counterexamples that weigh against the ALJ's reading of the record. I don't think it would be necessary to show that. But what is necessary is for the ALJ and for the board to do exactly what you just said, which is to do a comprehensive analysis of all of the individuals who applied and who they assert were discriminatorily denied employment. The ALJ decision, as adopted by the board, is that they did a comprehensive analysis and then in the written decision highlighted certain examples. Do you have something that says in the written decision they literally have to discuss with specificity every single example that supports the decision? I don't think I can give you a citation for that. But what I can point to are all of the decisions that I cited at the outset, including CNN America, where there was an 80-due-date trial. And, yes, in those cases, they were all examined. Another case we cited, I think it was Coleman, where there were 17 applications. And, yes, all 17 applications were examined. That would arguably be reasonable, when there are 17. When there are over 100, are you saying the ALJ literally has to discuss, in specificity, in writing, in the ALJ decision, every single 170-plus applications in order for the substantial evidence standard to be met? As a general proposition, yes, Your Honor. In practical application, as you approach a high number, there may be a problem with the ALJ reaching issues on a certain number. And those should go by the wayside. But I think it was the Coleman case, 17 applicants. The focus was on a biased, anti-union animus interviewer. The court, the board there, looked at all 17 and found no animus related to eight of the 17, but did find animus related to the nine. That is the kind of analysis that a federal agency is required to make. What we have in this case is, and I see my, I've got a minute left and I reserve two minutes. That is the kind of analysis that a federal agency is required to make. And in this case, it should have been made. Okay. I have one question before you sit down. On the second violation about bargaining at reopening, the two requirements are a temporary closing and then a reasonable expectation of being rehired. My understanding is there's no dispute by anybody that this was a temporary closing. So we're only talking about this reasonable expectation of rehiring. And my question is, why isn't Hotel Bel Air one determinative of that element? Your Honor, what we ask this court to do is to apply, as the board should have applied, its own decision in Sterling Processing. It's a case we decided at length. Yes, this hotel, and here are the similarities that are critical to applying Sterling Processing. Yes, it was a temporary closing. There is no material distinction regarding the temporary closing between Sterling Processing and Hotel Bel Air. In Hotel Bel Air, we had a targeted reopening date 18 to 24 months out. In Sterling Processing, it closed because of lack of business. And so there was no definite set date. However, viewed prospectively, they did reopen. They got new business, and they did, in fact, reopening in 19 months. And viewed retrospectively, throughout that period of time, the owner of the business was doing his best to drum up new business so he could reopen. And, most critically, during that hiatus period, kept the union in constant contact, quoting from that decision. So there's no difference on temporariness between Sterling and our case. As to right of recall, the board cases, Sterling, Golden State Warriors, and also Hotel Bel Air One, refer specifically and expressly to a right of recall, which is an objective standard. It's a contractual right under a collective bargaining agreement. Rehire, by contrast, is more amorphous. It calls for a subjective interpretation and an adjudication of whether the employees had a subjective right, a reasonable expectation of recall. There is no evidence in this record that supports the ALJs and the board's rubber stamping of the ALJs' simple declaration that there was a reasonable expectation of rehire. This court, in El Torito versus NLRB, had this issue. El Torito is distinguished also because that was a contract bar case. There was a collective bargaining agreement in place during the entirety of the hiatus, unlike this case, and also unlike Sterling, where there was no contract bar, no contract in place. But in El Torito, the issue did come up as to the reasonable expectation of rehiring. And if you look at footnotes five and six in that decision, 929, Fed Third, 409, 1991 by this court, this court said the issue for the court is whether the evidence supports reasonable expectation of rehire. Excuse me, recall, it used the word recall. But even if it's the rehire standard, there is no evidence in the record, the ALJ pointed to none, gave no analysis to support the proposition that these employees, after all the other evidence and facts that you've learned from our briefs, that at that point, in October of 2011, they had a reasonable expectation of rehire or recall. They certainly had no contractual right to it. They were presumably aware, and I think can be assumed to be aware, that the business model had changed. And I say that because that's mentioned in the Hotel Bel Air one decision that a topic of negotiation in the first case was the business model changes that the hotel was going to be making upon reopening. Unlike in the facts in El Torito, the employees were not given letters or promises at the outset that they would be recalled. Instead, that was the subject of the effects bargaining. The employees received a letter. But in the first case, it was stated that the fact that the hotel is making a final offer in that negotiation period, the fact that it's even doing that at all, indicates a concession in some sense that the employees had an expectation, a reasonable expectation. Your Honor, you'll have to forgive me. Could you rephrase the question or restate it? I'm sorry. What I'm struggling with is Hotel Bel Air one says that the fact that the hotel, when we're talking about reopening and getting going again, makes a final offer to these employees about coming back. That action demonstrates that everyone knew that these employees had an expectation of coming back. That exists in the first case. So why doesn't that just foreclose this issue? You're referring to the waivers of reinstatement that were issued in the first case following the declaration? No, I'm referring to just like the recognition of how this unfolded and the hotel's own actions. Well, the hotel negotiated, bargained the effects of the closer decision, and that negotiation took place over almost a year. One of the issues that was negotiated in those negotiations was whether to extend recall rights or not extend recall rights. No agreement was reached on that. Hotel Bel Air technically prematurely declared impasse and implemented an offer that it had made to the union, which at one point the union agreed to as a matter of principle that there could be waivers of reinstatement. So waivers of reinstatement, waivers of recall, if you will, letters went out. Descending out of those letters doesn't support the proposition. It goes the opposite direction of those employees having an expectation of rehire. They were never made a promise, unlike El Torito. What I'm hearing from you is the bottom line is in your position, without some sort of contract rights, there is no reasonable expectation. There is certainly no right of recall because recall is a contractual right. Okay. I understand your position. Okay. We'll give you some time for rebuttal. Thank you. Good morning. May it please the Court, Michael Hickson for the NLRB. The Board's orders are entitled to full enforcement as its findings are supported by substantial evidence in the record. First, the Board reasonably found that the company unlawfully refused to rehire 152 well-qualified laid-off unit employees because of their affiliation with the union and the company's desire to avoid a collective bargaining obligation. The Board's unlawful motive determination is amply supported by the record, including the company's prior related violations in Hotel Bel Air 1, as well as Ms. Arbazue's revealing testimony about the preventative measures that the company took to keep the union out upon reopening, and the pervasively pretextual and biased conduct of the company in its restaffing process. With respect to the earlier violations in Hotel Bel Air 1, those occurred, those were committed by the company during the same temporary closure at issue in this case. They were directed at the same reemployment prospects of the same unit employees, and they involved, as here, the circumvention of those employees' longstanding collective bargaining representative. In Hotel Bel Air 1, the employer unlawfully quit the bargaining table, bypassed the union, and unlawfully attempted to induce the laid-off unit employees to waive their rights to reemployment upon reopening. Lo and behold, in this case, as that reopening approached, the employer refused to reemploy those very same employees. As for Ms. Arbazue's testimony, she candidly admitted on the stand that the employer's only preparations to deal with the union upon reopening were its, quote, preventative, unquote, measures to keep the union out. This, of course, reflects the assumption that the union would not be in, and Ms. Arbazue's testimony, therefore, shows that the employer both wanted and planned to reopen its hotel with an unrepresented workforce. With respect to the company's hiring conduct, the record evidence is ample. The employer repeatedly deviated from its own hiring protocols, scrapped its own interviewers' determinations and assessments of candidates, rejected former employees while giving no explanation whatsoever, gave only suspicious, inconsistent, and sometimes outright bogus reasons for rejecting other former employees, and desperately bypassed well-qualified employees with years, sometimes decades of experience successfully performing the very same jobs, and instead hired far less qualified outside applicants at times with little to no relevant experience. Before the court, I guess I'd like to just first highlight that I think it's extraordinarily telling, especially in light of the substantial evidence standard that governs the court's review of the discriminatory refusals to rehire, that the company, not in its opening brief, not in its reply brief, and not here before the court, has even attempted to meaningfully engage with the overwhelming evidence of pretext and bias in the hiring process. The company instead offers only meritless arguments about why it should not have to engage with that evidence. It claims, for example, that the interview forms were hearsay, and therefore the board was wrong to rely on them. First of all, that argument is not before the court, and the court, in fact, does not have jurisdiction to consider the argument under Section 10e of the Act because the employer did not raise it before the board. We pointed that out in our brief to the court, and in its reply, the company offers no response. What about the board just saying, hey, we already found this in Hotel Bel Air 1, and so that's enough? Did the board have a greater duty to go into depth and explain? I mean, we can infer that the arguments you've made are, hey, this was the same closure, there's some temporal closeness here, but those weren't reasons that the board never actually said that. Well, Your Honor, I guess a couple of points. The first thing I would say is that, again, our position is that similarly to the point I was making a moment ago, that issue also is beyond the court's jurisdiction as the company did not raise that argument before the board. If the company had said so to the board, the board could have chosen to elaborate further. And that is our position. The court does not have jurisdiction to consider that argument. But in any event, it is meritless. There is an adequate basis in the decision to uphold the board's finding that the Hotel Bel Air 1 violations support the overall conclusion of an unlawful motive, and the board did not rely only on the violations. It relied on all the evidence I just sort of summarized. But in terms of the prior violations, the board did discuss them both in the facts and in the analysis. In the facts, the temporal proximity was established. I'd like to correct a point that counsel made about a two-year gap. It's not a two-year gap. It's a one-year gap. The violations in Hotel Bel Air 1 were July 2010. The violations in the refusals to hire were July 2011. And, of course, that one-year gap is only because, given that they're still hammering away on the hotel and renovating it, they weren't prepared to pursue their discriminatory intent sooner. But in the analysis, the judge also points out that the violations in Hotel Bel Air 1 involved the company's I'm sorry, I'm blinking on the exact phrasing, but it's something very close to unlawful efforts to obtain the employee's waivers of reinstatement. So the judge was pointing out that strong factual connection that, in Hotel Bel Air 1, they took unlawful actions before the court. These are undisputedly unlawful actions that entailed an attempt to induce the former employees to forfeit their reemployment rights. And then, in this case, they're refusing to reemploy those same employees. That is in the decision. So let me ask you, you said there was evidence of 152. But, you know, opposing counsel says, well, you only looked at 14 of them specifically. To what degree can you impute to the others? I mean, what was the factual underpinnings for the others? I mean, I get that there's at least evidence in the record to support these 14. But can we only rely on the 14? Or is your position we can rely on all 152? Well, Your Honor, your honors, of course, have jurisdiction to review on the whole record under the substantial evidence standard. It's substantial evidence to support the board's findings on review of the whole record. The board didn't. But, I mean, it's not a summary judgment standard. Like, we have to look at what the board relied on. And the board really looked at these 14 and then drew from a conclusion from that, at least as I read it, drew from a conclusion from that that all 152, this was like a representative sample that qualified for 152. Is the board's position that even if it were just limited to these 14, that would be enough to support Animus? Well, Your Honor, the thing is the board didn't just look at the 14. The board looked at the whole record and made specific finding that, quote, the record was replete with, quote, countless additional similar examples displaying the disparate treatment, the deviations from protocol, the bogus reasons, et cetera, et cetera. It gave a detailed and, you know, individual treatment specifically highlighting 14 examples in terms of former employees. But it was very clear that those were just examples and that the record is replete with more similar examples. And we've shown. They pointed to for the other. I mean, I assume they're taking 14 out of 152. So you've got, you know, 136 or whatever, 138 that they just sort of made generalized statements that that's in the record. But what did they actually point to for those other 138? Your Honor, I'm not sure. I mean, I'm not exactly sure how to answer. I want to answer your concern, but I'm not sure because, I mean, they made both broad findings based on a review of the whole record that. How do we review whether those findings were supported by substantial evidence? By considering the whole record, including the examples that were specifically highlighted in the decision, as well as the numerous additional examples that were in the record before the board and now before the court that we've highlighted, the union has highlighted. Your position is, even if they didn't detail that in the decision document, that we could go in for ourselves and look at whether the evidence supports what the board was saying. Absolutely, Your Honor, especially in light of the board's broad findings that these were merely examples and that the record was replete with countless additional similar examples. And what we've shown are similar examples that further support those findings. There is no precedent that I'm aware of, and counsel certainly has not cited any precedent that sets any kind of baseline threshold of either raw number or percentage of examples. Well, that's a separate question. I mean, I think there's a separate question of whether the 14 would be enough. But if we were – I mean, you could imagine a situation where they say, hey, you know, we've got 152 examples. Here's – we're going to go into the specifics of 14 of these and just trust us, you know, the other 138 are satisfied. As a court, I don't think we have a duty or even an ability to go in and look and say, well, do we think – because then you're asking us to step into the fact-finding. So we're stuck with what that board says, and if they don't give any defense to support the other 138, I'm not sure it's a matter, I mean, of extrapolating. That's problematic. So I wonder if we're just left with, hey, are these 14 enough for substantial evidence? Now, maybe they are. Or maybe we need to remand it to say, hey, give us an explanation for the other 138. Well, Your Honor, I guess I'd make a few points in response if I could. The first is that I think, again, incredibly telling is that the company does not even engage with the 14, and the 14 are remarkably damning evidence of unlawful motive. I don't know if we think that the 14 is enough on its own, but that's not what the board said. The board said there's 152 examples. We don't know what the board would say. Would they find the same animus ruling if it were just 14? Your Honor, let me clarify something. In these mass discrimination cases, particularly where it involves an attempt to avoid a collective bargaining obligation, it's a generalized group-directed animus against the group of employees. There is no requirement in any of these cases that there be individualized evidence of, say, disparate treatment or bogus reasons. No, I understand that. But counsel's argument, I mean, the import of it seems to be look at these other cases. The board did a lot more in these other cases, and they didn't do that here. And so are we entering into a slip? If we approve this, and admittedly, like, we've still got the Hotel Bel Air issue, and we've still got the managers issue, so, I mean, I don't want to suggest that this rises or falls on this question. But if we were to go down this, would we be entering a slippery slope where next time the board just comes forward and says, look, we looked at one of these. It looks pretty bogus. So we're going to just, we think that the other 151 are bogus too. I don't think so. I don't think so, Your Honor. I'm not sure. I guess that the board reviewed the whole record. It made these broad findings. Yeah, but they have to support it. I mean, it's not enough to just say, hey, we reviewed the record, and, you know, we've come to this conclusion. Right, Your Honor. And they did support it by giving, highlighting 14 individualized named examples and then saying there are countless similar examples. And we've identified those. I'd also like to point out that the board did also, as we note in our brief, specifically highlight its reliance on the class or group, I guess, either way, of applicants who were rejected by the manager, Andre Godjic. And it clearly identified the class of applicants it was referring to there as those who Godjic had rejected allegedly at the departmental interview stage, although no departmental interview was conducted, by merely initialing his initials, AG. And that's also part of the 150. That's separate from the 14 examples. So some of them, Your Honor, some of that group are also in the 14, but setting aside those ones that are in that group of Godjic that are in the 14, setting those aside, that's an additional 23 employees at least that we've identified in our brief. And, again, the company has no response to any of this, and they've completely waived the Godjic argument by failing. I agree, but at some point, I mean, you would acknowledge that at some point, I mean, the board couldn't have just, they highlighted 14 of these. You would probably agree that if they just said one or two of these, we're going to walk through and give examples, that might not have been enough. I would agree that that would change things, Your Honor. Of course, that's, you know. Has the company in either the briefing before the ALJ, the board, or this court ever identified with specificity examples that weren't discussed in the board or an ALJ decision that counter the inference that the board drew or provide or support the company's contention as to its reason for not hiring these employees? No, Your Honor. With one very limited, meager, and not helpful to the company exception, which is in their reply brief, they purport to cite to three people, how can I say this, three, they purport to cite to documentary evidence of three outside applicants whom Godjic interviewed and apparently were hired where Godjic kind of minimally marked the form in a way similar to the minimal markings that the board relied on. For a number, so that's the only place. That's the only place. First, that issue is not before the court because although the company raised certain arguments about Mr. Godjic before the board, it never raised that argument whatsoever. So the court does not have jurisdiction to consider that argument. It's also waived because in their opening brief, they made no argument. They just have a footnote saying, we don't agree about Godjic. End of story. And additionally, I just discovered a couple of days ago upon review of those three examples, it appears that two of them are actually not even in the record. The first one is in the record. It's cited in GC Exhibit 2. The other two I was not able to find anywhere in the record. One of them doesn't have any exhibit stamp on it. The other one has an exhibit stamp that claims that it's Employer Exhibit 71. However, Employer Exhibit 71 is actually an entirely different document. So for a number of reasons, those hold no water, don't help the company at all. And other than that, there's no response. There's no response on the evidence of hiring disparity in pretext. Unless the court has other questions, of course, I'd welcome the opportunity. Otherwise, I just ask the court to enforce both board orders in full. Thank you. Thank you, counsel. And we've got five minutes for our counsel on the phone or video. Good morning, Your Honors, and may it please the court. This case is remarkable in that both the big picture and the granular details are equally fatal to the company's position. So stepping back to see the big picture. This is an employer which has already broken the law before with respect to its former employees. It was so determined to obtain waivers of employees' reinstatement rights that it bypassed their union and dealt with them directly. In other words, the company was willing to violate the NLRA in order to rid itself of its prior workforce. And now this same company asks this court to believe that after a temporary closure for renovation, it disregarded these same employees' years and decades of experience and excellent work performance and refused to hire an overwhelming majority of them, ostensibly for reasons wholly unrelated to any anti-union animus or desire to avoid unionization. There can be no reasonable dispute that even prior to this renovation, the Bel Air was an elite luxury hotel and one of the most highly regarded hotels in all of Los Angeles. Any employee who is able to last for 5, 10, let alone 20 years at a property like that is as exceptional as the hotel itself. They must be highly skilled, detail-oriented, efficient, courteous, and prompt, and they must meet those standards day after day, subject to regular inspection, evaluation, and feedback from a very demanding clientele. For many years, the company itself was the final judge of these employees' merits and qualifications, and it did not find them wanting. And yet, upon reopening, the company was prepared to treat these same employees as strangers and flatly dismiss their obvious fitness to return to the jobs they had faithfully carried out for so long. This is, on its face, incredible. As the Board has noted in prior case law, employers tend to prefer former employees who are a known quantity over outside applicants. To justify its actions, the company relied on an ostensibly neutral hiring fare, which the record demonstrates was in fact riddled with inconsistencies and disparate treatment, and self-serving representations about the hotel's post-renovation business model, which were contradicted by the company's own witnesses and documentary evidence. The Board corrects... Can I ask, Counsel, can I ask about the evidence here regarding... It was curious that they did suggest that prior employees come in first and they gave them a special time to do it, but as Counsel pointed out, like, they didn't have to do that. I mean, they would have known who their prior employees are from the application materials or just, you know, their familiarity with them. So why is it important that they set up this separate time for them to come in? Well, Your Honor, the company is pleading innocence before you now in saying that it was a courtesy. But in fact, the company went to great lengths to show that it had brought in a whole new management team, that it brought in this whole new group of evaluators and interviewers who are unaffected by any prior knowledge of the workforce, any prior animus or anything like that. And then, of course, this contention that, in essence, this was a new group who, because they hadn't worked with these former employees, wouldn't even know who these former employees were, who was or wasn't a former employee. But they wouldn't know from the applications. I mean, presumably they would have listed prior employment with Bel Air for 20 years. Like, I mean, it just seems like a curious way for the company to go about this if that was their intent. Well, Your Honor, I find it extremely suspect. And I think that the board was completely justified in relying on it as evidence of, again, what it found to be an overall scheme intended to weed out former employees and eliminate candidates from the former unionized workforce. So to turn to some of the details, the company on this day when former employees are called in in the morning excludes 67 former employees at the first initial conversation stage of the hiring process. Now, this was a brief screening interview lasting somewhere from mere seconds to a few minutes. So the majority of these 67 workers had worked for the hotel for five years or more. Twenty-nine of them had at least 10 years of service. So we can picture an employee returning to apply for a job they held for 10 years and what they might reasonably expect. Maybe their personnel file or a previous supervisor or manager is on hand to discuss their performance. But in fact, they were asked three cursory questions and shown the door. Now, remarkably, of these 67, 18 former employees received completely positive evaluations on their initial conversation and were still removed from consideration and not advanced to the following stage of the process. The company gave absolutely no reason, either during the hiring fair or at trial, for rejecting these workers, many of whom were veteran employees. The company rejected 39 employees for lack of communication or hospitality skills. A third of these workers had worked at the hotel for over 20 years as room attendants, linen attendants, dishwashers, bussers, engineers, and food runners. Where the company did bother to evaluate former employees' past work experience at the hotel and their qualifications as disparate treatment was equally evident. The company rejected 20 former employees for insufficient... I apologize. I'm over. Well, I think we have your argument. Thank you so much, Your Honors. We ask that you enforce these orders and dismiss the company's petition for review. Thank you. Thank you very much. We'll give you two minutes for rebuttal. Your Honors, there is no evidence of an attempt to weed out the former employees. The evidence instead is to the contrary. This is coupled... That seems like a broad statement to say there's no evidence. To weed out, there's no... There was a plan to limit the hiring of the former employees. There's no evidence of a quota. You're saying there's no direct evidence, but the precedent of case law is very clear. There's no requirement of direct evidence of motive because the reality is it's extremely hard to come by. So there's case after case that says, you know, the board is allowed to infer that motive from circumstantial evidence, evidence of pretext, and so on. So the absence of direct evidence of motive does not mean that there is not substantial evidence to support the board's finding. And what I don't hear you contending with is the substantial evidence standard of review. We're not allowed to redraw inferences. The board is allowed to draw inferences from the evidence. We're not allowed to reweigh the evidence. We would have to find that no reasonable fact finder would have found as the board did or that any reasonable fact finder would be compelled to conclude otherwise. And, Your Honor, I do not believe that this court can do that in this case based upon the weakness and the limit of the record. We have only these 14 examples. And bear in mind, these were pieces of paper, no cross-examination, no witnesses. They were viewed six years after the interviews in question. We are called upon in the decision as having not given explanations for why certain decisions were made on Billy Bob Thornton's application six years after the fact when the only evidence available concerning what happened between that interviewer and that interviewee is reflected on that piece of paper. How can we defend what has been presented when the general counsel fails to put on an adequate case of substantial evidence and of proof of animus and has the burden of production and the burden of persuasion? Under transportation management, the Supreme Court decision that approved the right-line case, there must be substantial evidence. And it's more than just... that it had a legitimate reason. And we have presented clearly legitimate reasons supported by Supreme Court authority that we have the right to rearrange our business and to, in the context of closing for two years and a major two-year renovation, to respond to the competition  which required a different type of employee. None of those cases say that that right includes the right to discriminate against former union-affiliated employees. Your duty of proof, your burden of proof before the NLRB was to prove that your stated reason was a legitimate non-discriminatory reason and that, in fact, was the reason why these employees were not hired. The evidence supports that it was a legitimate reason. The testimony we provided was unrebutted concerning the types of employees that we needed for the new business model, the interview process, the hiring process. There's no evidence suggesting that that was executed or carried out in a discriminatory manner, unlike what's found in the CNN America case, for example. We have presented a legitimate reason for the decision that we made, and we had the right to do that. We had the right to rearrange the business, which includes, as the Supreme Court stated in Burns Security and Fall River Dying, the right to change the composition of the workforce. This was a business decision for survival because the business was dying. The business was moribund. As stated by Burns in a successorship case, an employer has the right, as stated by John Wiley, another Supreme Court case from 1964, national labor policy includes the right of a business to make changes to survive. Property rights must be balanced against employment rights. But in this context, an NLRB decision, I can't give you a bright-line, one-sentence definition of substantial evidence, but this case is not it. Thank you, Counsel. We appreciate the arguments from all counsel in this case. The case is now submitted, and that finishes arguments for the day. Thank you, Your Honor.
judges: NELSON, FORREST, SUNG